

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**

**FORT WORTH**

**NO. 02-13-00441-CV**


CLARK W. BRAZIL, M.D.                                                    APPELLANT

V.

MAYRITA J. ROBERTS HILLMAN                                       APPELLEE
AS GUARDIAN OF THE ESTATE
OF JENNIE M. STOKES, AN
INCAPACITATED PERSON


----------

FROM THE PROBATE COURT OF DENTON COUNTY
TRIAL COURT NO. PR-2009-00220-01

----------

# MEMORANDUM OPINION[1]

----------

Appellant Clark W. Brazil, M.D. appeals the trial court's order denying his

motion to dismiss the claims of Appellee Mayrita J. Roberts Hillman as guardian

of the estate of Jennie M. Stokes, an incapacitated person, for her failure to

---

[1]*See* Tex. R. App. P. 47.4.

comply with the expert report requirement of chapter 74 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(9), 74.351(b) (West Supp. 2014). We will reverse.

Hillman is Stokes's daughter and the guardian of her person and estate. She alleged in her first amended petition that a number of individuals and entities, including Dr. Brazil, had participated in or had knowledge of a concerted effort to scheme or defraud Stokes of her property at a time when she lacked mental capacity.[2] Specifically, Hillman averred that Richard and Brenda Bowen had become acquainted with Stokes, realized that she "had memory issues and had dementia and was deteriorating," "injected themselves . . . into [her] life . . . and her business," and "began an affirmative and concerted effort to steal her property and Estate for the sole purpose of enhancing themselves." Stokes had hired attorney Michael Payne to help her collect a delinquent loan that she had made to Hillman, but Payne "orchestrat[ed] the dissolution" of Stokes's living trust, presumably helped Richard Bowen in obtaining a power of attorney over Stokes, and assisted Richard and Brenda Bowen obtain property or loans from Stokes with a value in excess of $1,500,000. According to Hillman, Dr. Brazil, who was Stokes's physician from 1998 to 2009, knew of her incapacity, encouraged her to see Payne, and supported Payne's, Richard's, and Brenda's actions. Hillman also complained of wrongdoing by Merle and Linda Bowen;

---

[2]Stokes ran an accounting business, managed numerous rental properties, and had a living trust for her exclusive benefit for her lifetime.

2

Harold Don Wolfe, Sr. and Harold Don Wolfe, Jr.; Wells Fargo Bank, N.A.; Wells Fargo Bank, N.A., as Trustee; and ON-T-J, Inc., a corporation apparently owned by Payne.

Hillman pleaded claims against Dr. Brazil for breach of fiduciary duty, undue influence and duress, aiding and abetting, civil conspiracy, and money had and received. She alleged that Stokes lacked the mental capacity to understand the business in which she was engaged when she conducted all of the complained-of transactions with the defendants. Hillman sought damages and the return of Stokes's property. She did not serve Dr. Brazil with a chapter 74 expert report.

Dr. Brazil generally denied Hillman's allegations and later filed a motion to dismiss her suit, arguing that Hillman was required, but had failed, to serve an expert report. *See id.* § 74.351(b). At the hearing on his motion to dismiss, Dr. Brazil argued that Hillman's claims against him are health care liability claims because they center upon her allegation that Stokes did not have the mental capacity to understand the complained-of transactions that she conducted with the defendants that form the basis of this suit. That underlying allegation—that Stokes lacked mental capacity—is contrary to Dr. Brazil's treatment opinion that she was mentally competent to operate her businesses. According to Dr. Brazil, this conflict regarding Stokes's competency implicates his care of her and necessitates expert testimony. Although Hillman acknowledged that she had

3

retained an expert to testify that Stokes was mentally incompetent when she entered into the disputed transactions, Hillman contended that she did not allege that Dr. Brazil violated any standard of care; her single assertion against him is that he was complicit in a scheme to defraud her. The trial court denied Dr. Brazil's motion but allowed him to admit evidence, including excerpts from Hillman's deposition, as part of a "bill of review,". This interlocutory appeal followed.

Dr. Brazil argues in his first and third issues that chapter 74's expert report requirement applies to Hillman's claims because his opinion that Stokes was competent to conduct business is central to all of Hillman's claims, inseparable from the rendition of medical care that he afforded to Stokes, and must be refuted by expert testimony. Hillman responds that her claims are not health care liability claims because she has not alleged that Dr. Brazil was negligent in failing to properly diagnose or treat Stokes. She instead complains of Dr. Brazil's alleged participation in the scheme to defraud Stokes—actions that Dr. Brazil took when he "stepped out of his shoes" as Stokes's physician.

We normally review the denial of a section 74.351(b) motion to dismiss under an abuse of discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). But when the issue is whether chapter 74 applies to the plaintiff's claims—a matter of statutory interpretation—

4

we apply a de novo standard of review. *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012).

The Medical Liability Act (MLA) requires that a claimant bringing a health care liability claim must, not later than the 120th day after the date each defendant's answer is filed, serve on each party or the party's attorney one or more expert reports for each physician or health care provider against whom a liability claim is asserted. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). A health care liability claim has three elements: (1) a physician or health care provider must be a defendant; (2) the claim or claims at issue must concern treatment, lack of treatment, or a departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care; and (3) the defendant's act or omission complained of must proximately cause the injury. *Id.* § 74.001(a)(13) (West Supp. 2014); *see Loaisiga v. Cerda*, 379 S.W.3d 248, 255 (Tex. 2012). The MLA "creates a rebuttable presumption that a patient's claims against a physician or health care provider based on facts implicating the defendant's conduct during the patient's care, treatment, or confinement" are health care liability claims. *Loaisiga*, 379 S.W.3d at 252.

Hillman does not dispute that Dr. Brazil is a physician. Moreover, as explained below, Hillman's claims against Dr. Brazil are based in part on facts that implicate his conduct while caring for Stokes. Thus, the rebuttable

5

presumption that Hillman's claims against Dr. Brazil are health care liability claims applies, and we must determine whether Hillman has rebutted the presumption. *See id.*

The determination of whether a cause of action is a health care liability claim requires an examination of the claim's underlying nature. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 847 (Tex. 2005). It is the gravamen of the claim that controls, not the form of the pleadings, the characterization of the claims, or the injuries suffered. *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 664 (Tex. 2010); *Diversicare*, 185 S.W.3d at 851. A cause of action alleges a departure from accepted standards of medical or health care if the act or omission complained of is an inseparable part of the rendition of medical services. *Diversicare*, 185 S.W.3d at 848. Further, if expert medical or health care testimony is necessary to prove the merits of a claim against a physician, the claim is a health care liability claim. *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182.

We proceed with the understanding that "[t]he broad language of the [MLA] evidences legislative intent for the statute to have expansive application." *Loaisiga*, 379 S.W.3d at 256. And unlike when reviewing the adequacy of an expert report, we may consider the entire record when determining whether a cause of action is a health care liability claim. *Id.* at 258.

Although Dr. Brazil does not specifically identify whether Hillman's claims against him implicate treatment, lack of treatment, a departure from accepted

6

standards of medical care, or a departure from accepted standards of health care, he contends that his opinion regarding Stokes's competency "is inseparable from the rendition of medical care." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). We therefore direct our focus to that element.

"Medical care" means "any act defined as practicing medicine under Section 151.002, Occupations Code, performed or furnished, or which should have been performed, by one licensed to practice medicine in this state for, to, or on behalf of a patient during the patient's care, treatment, or confinement." *Id.* § 74.001(a)(19). The occupations code defines "[p]racticing medicine" as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions, by a person who . . . publicly professes to be a physician." Tex. Occ. Code Ann. § 151.002(a)(13)(A) (West Supp. 2014).

Dr. Brazil conducted discovery to examine the nature of Hillman's claims. He deposed Hillman, who testified that Dr. Brazil had breached a fiduciary duty that existed between him and Stokes. Hillman explained that Dr. Brazil should have contacted her or her family when Stokes began demonstrating increased signs of dementia and reduced mental faculties. Hillman exclaimed, "I believe a responsible physician would take steps to protect that person."

Hillman's breach-of-fiduciary-duty claim against Dr. Brazil is thus premised in part upon an omission that he allegedly committed while caring medically for

Stokes—failing to contact Hillman or her family. The alleged omission is an inseparable part of the medical care that Dr. Brazil rendered to Stokes, and expert testimony will be required to establish the standard that Dr. Brazil should have followed when he supposedly observed that Stokes's mental faculties were waning. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 182; *Diversicare*, 185 S.W.3d at 848.

Another aspect of Hillman's breach-of-fiduciary-duty claim entails something that permeates all of her other claims against Dr. Brazil—the allegation that Stokes lacked the mental capacity to understand the business in which she was engaged when she conducted the transactions that Hillman seeks to reverse. The essence of Hillman's claims against Dr. Brazil is that he assisted the other defendants in their fraud scheme by encouraging Stokes, *whom he knew lacked the mental capacity to make business decisions*, to go see Payne. Indeed, Stokes's lack of mental capacity is an indispensable part of Hillman's claims. Dr. Brazil, however, confirmed that he had no relationship with Stokes outside of his medical care for her. Consequently, he could not have known about Stokes's alleged lack of mental capacity—and then referred her to Payne to be taken advantage of—in the absence of performing medical care for her. In other words, Dr. Brazil's rendition of medical care to Stokes and his referral to Payne of a known incompetent are unquestionably inseparable and not mutually exclusive. *See Diversicare*, 185 S.W.3d at 848.

8

Moreover, Hillman explained during the hearing on Dr. Brazil's motion to dismiss that she had hired an expert for the purpose of "affirm[ing] that [Stokes] was, in fact, mentally incompetent." The testimony will contradict Dr. Brazil's opinion that with the exception of a brief period of time in 2007, he otherwise opined that Stokes "had good mental faculties and could conduct her business without any problems." The need for expert medical testimony underscores that the claims are subject to chapter 74. *See Tex. W. Oaks Hosp.*, 371 S.W.3d at 182.

In *Saleh v. Hollinger*, Toni Hollinger complained that Dr. Saleh had stolen and sold her eggs after she had visited Dr. Saleh to have a surgical, in vitro fertilization performed. 335 S.W.3d 368, 371–72 (Tex. App.—Dallas 2011, pet. denied). Dr. Saleh moved to dismiss Toni's claims for failure to serve a chapter 74 expert report, but the trial court denied the motion. *Id.* at 372. Toni argued in the court of appeals that

> she does not complain about the medical procedures performed in connection with the harvesting of eggs and the insemination process. She asserts that her claims against Dr. Saleh . . . stem from the alleged sale of her eggs and are not health care liability claims. . . . She argues that an unlawful act of theft cannot be deemed part of a patient's medical or health care, and no accepted standard of medical or health care includes theft.

*Id.* at 374. The court of appeals disagreed, concluding that the acts and omissions of Dr. Saleh concerning the handling and disposition of Toni's eggs were an inseparable part of the rendition of medical services and that expert

9

testimony would be needed to discuss the relevant duties of care owed by a physician to the patient. *Id.* at 375–76.

*Saleh* is persuasive here because like the plaintiff in that case, Hillman is attempting to divorce an alleged improper extracurricular act by a physician from the rendition of medical care by the same physician. But like the court in *Saleh* concluded, the two are inseparable. In the absence of rendering medical care to Stokes, Dr. Brazil could not have assisted the other defendants in their scheme by directing Stokes, a person whom he knew lacked the mental capacity to make business decisions, to consult with Payne.

We understand Hillman's argument that she has not specifically alleged that Dr. Brazil negligently determined that Stokes was mentally competent or that he breached a particular standard of care, but that is not dispositive. The supreme court has explained that "claims premised on facts that *could* support claims against a physician or health care provider for departures from accepted standards of medical care [or] health care . . . are [health care liability claims], regardless of whether the plaintiff alleges the defendant is liable for breach of any of those standards." *Loaisiga*, 379 S.W.3d at 255 (emphasis in original).

Regarding the third element of a health care liability claim, Hillman argues that Dr. Brazil's alleged misconduct did not proximately cause her injury because she did not sustain personal injuries. This court has previously declined to "add the word 'physical' to the injury requirement of the [MLA]," and we also decline to

10

do so here.  *See TTHR, L.P. v. Coffman*, 338 S.W.3d 103, 109–11 (Tex. App.—Fort Worth 2011, no pet.).

Hillman failed to rebut the presumption that her claims against Dr. Brazil are health care liability claims because the claims involve an alleged departure from accepted standards of medical care.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13), (19).  Accordingly, Hillman's claims are health care liability claims subject to the expert report requirement contained in section 74.351, and the trial court erred by denying Dr. Brazil's motion to dismiss.  *See id.* § 74.351(a), (b).  We sustain Dr. Brazil's first and third issues.  We do not reach his second issue in which he complains that the trial court erred by refusing to receive evidence.  *See* Tex. R. App. P. 47.1.

Dr. Brazil argues in his fourth issue that he is entitled to an award of attorneys' fees.  When the required expert report has not been timely served, the court, on the motion of the affected physician, shall dismiss the claims against the physician with prejudice and award the physician reasonable attorneys' fees and costs incurred.  *See id.* § 74.351(b)(1)–(2).  To the extent that Dr. Brazil argues that we should remand this cause to the trial court for a determination of attorneys' fees, we sustain his fourth issue.  *See Ramchandani v. Jimenez*, 314 S.W.3d 148, 153–54 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (remanding issue of attorneys' fees to trial court when defendant presented evidence of fees in trial court).

Having sustained Dr. Brazil's first and third issues, we reverse the trial court's order and render judgment dismissing Hillman's claims against Dr. Brazil. Having sustained in part Dr. Brazil's fourth issue, we remand this cause to the trial court for a determination and award of reasonable attorneys' fees and costs to Dr. Brazil.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MEIER, JJ.

DAUPHINOT, J., concurs and dissents without opinion.

DELIVERED:  September 25, 2014